

UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

AUSTIN J. HARIG,                                   )
                                                   )
        Plaintiff,                                 )
                                                   )
                v.                                 )        Case No. 1:18-cv-00503
                                                   )
CITY OF BUFFALO, JASON HEIDINGER,                  )
LISA WEDLAKE, DOUGLAS HAYDEN,                      )
JOHN BANNISTER, KYMA DICKINSON,                    )
SARA JO KEATON, JOSHUA HEIDINGER,                  )
MICHAEL SULLIVAN, CARYN ANDERSON,                  )
PATRICK MCDONALD, and                             )
ROBERT FELSCHOW,                                   )
                                                   )
        Defendants.                                )

**OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO**
**STRIKE AND GRANTING DEFENDANTS' MOTION FOR**
**SUMMARY JUDGMENT**
(Doc. 39)

This action arises out of Plaintiff Austin J. Harig's ("Plaintiff") arrest on June 8,
2016 for allegedly allowing minors to drink alcohol and smoke marijuana in his
apartment as well as his arrest on August 25, 2016 for an assault that took place at his
apartment. He asserts claims against Defendants City of Buffalo ("Defendant City"),
John Bannister ("Defendant Bannister"), Sara Jo Keaton ("Defendant Keaton"),[1] Kyma
Dickinson ("Defendant "Dickinson"), Joshua Heidinger, Jason Heidinger, Michael
Sullivan ("Defendant Sullivan"), Lisa Wedlake ("Defendant Wedlake"),[2] Douglas
Hayden ("Defendant Hayden"), Caryn Anderson ("Defendant Anderson"), Robert

---

[1] Plaintiff also refers to Defendant Keaton as Sara Jo McCormick. The court will refer to her by
Defendant Keaton, the name provided by Plaintiff in the caption and used by Defendants.

[2] Also referred to by Plaintiff as Lisa Brandt.

Felschow ("Defendant Felschow"), and Patrick McDonald ("Defendant McDonald") (collectively, "Defendants"). Each individual Defendant is alleged to be a Buffalo Police Department ("BPD") police officer or a police lieutenant employed by Defendant City during the relevant time. Plaintiff's claims are asserted against Defendants in their individual and official capacities.

Plaintiff alleges five causes of action arising out of his June 8, 2016 arrest, which he frames as follows: malicious prosecution in violation of the Fourth and Fourteenth Amendments pursuant to 42 U.S.C. § 1983 against Defendants City, Anderson, McDonald, and Felschow (Count I); false arrest in violation of the Fourth and Fourteenth Amendments pursuant to 42 U.S.C. § 1983 against Defendants City, Anderson, McDonald, and Felschow (Count II); failure to prevent unconstitutional acts in violation of the Fourth, Fifth, and Fourteenth Amendments pursuant to 42 U.S.C. § 1983 against Defendants Anderson, McDonald, and Felschow (Count III); assault in violation of the Fourth and Fourteenth Amendments pursuant to 42 U.S.C. § 1983 against Defendants City, Anderson, McDonald, and Felschow (Count IV); and battery in violation of the Fourth and Fourteenth Amendments pursuant to 42 U.S.C. § 1983 against Defendants City, Anderson, McDonald, and Felschow (Count V).

Plaintiff also asserts causes of action arising out of his August 25, 2016 arrest, which he frames as follows: malicious prosecution in violation of the Fourth and Fourteenth Amendments pursuant to 42 U.S.C. § 1983 against Defendants City, Hayden, Bannister, Dickinson, Keaton, Joshua Heidinger, Jason Heidinger, Anderson, Wedlake, and Sullivan (Count VI); false arrest in violation of the Fourth and Fourteenth Amendments pursuant to 42 U.S.C. § 1983 against Defendants City, Hayden, Bannister, Dickinson, Keaton, Joshua Heidinger, Jason Heidinger, Anderson, Wedlake, and Sullivan (Count VII); failure to prevent unconstitutional acts in violation of the Fourth, Fifth, and Fourteenth Amendments pursuant to 42 U.S.C. § 1983 against Defendants Hayden, Bannister, Dickinson, Keaton, Joshua Heidinger, Jason Heidinger, Anderson, Wedlake, and Sullivan (Count VIII); assault in violation of the Fourth and Fourteenth Amendments pursuant to 42 U.S.C. § 1983 against Defendants City, Hayden, Bannister, Dickinson,

Keaton, Joshua Heidinger, Jason Heidinger, Anderson, Wedlake, and Sullivan (Count IX); and battery in violation of the Fourth and Fourteenth Amendments pursuant to 42 U.S.C. § 1983 against Defendants City, Hayden, Bannister, Dickinson, Keaton, Joshua Heidinger, Jason Heidinger, Anderson, Wedlake, and Sullivan (Count X). In addition, Plaintiff alleges malicious prosecution under state common law against all Defendants (Count XI).

On February 26, 2021, Defendants moved for judgment on the pleadings with regard to certain claims and for summary judgment. On May 10, 2021, Plaintiff opposed that motion and cross-moved for summary judgment. The court denied Plaintiff's cross-motion on September 27, 2021 as untimely but agreed to treat the facts and arguments set forth therein as support for his opposition to Defendants' motions.

Because Plaintiff consented to dismissal of certain claims at oral argument, the court dismissed all claims against Defendant City; Counts IV, V, IX, and X; all official capacity claims against the individual Defendants; and the claims arising out of Plaintiff's August 25, 2016 arrest against Defendant Anderson.

Plaintiff is represented by Chad A. Davenport, Esq., and James Ostrowski, Esq. Defendants are represented by David M. Lee, Esq.

I.    **Whether Defendants are Entitled to Judgment on the Pleadings.**

Defendants assert that they are entitled to judgment on the pleadings with regard to Plaintiff's claims against Defendants McDonald and Felschow arising out of Plaintiff's August 25, 2016 arrest because Plaintiff does not allege their personal involvement in that event. In addition, Defendants contend that Plaintiff's August 25, 2016 malicious prosecution claim must be dismissed against Defendants Wedlake, Hayden, Dickinson, Joshua Heidinger, and Jason Heidinger because they were not involved in charging him with a crime.

Federal Rule of Civil Procedure 12(c) provides "[a]fter the pleadings are closed--but early enough not to delay trial--a party may move for judgment on the pleadings." A Rule 12(c) motion is judged by the same standards applicable to a Rule 12(b)(6) motion to dismiss. *See Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 644 (2d Cir. 1998).

The standard of review on a Rule 12(b)(6) motion requires the court to accept the factual allegations in the complaint as true and draw all reasonable inferences in Plaintiff's favor. *Martine's Serv. Ctr., Inc. v. Town of Wallkill*, 554 F. App'x 32, 34 (2d Cir. 2014). However, legal conclusions are not assumed to be true, and "[t]he complaint must plead factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (internal quotation marks omitted); *see also Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002) ("[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss") (internal quotation marks omitted) (brackets in original).

A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The sufficiency of a plaintiff's complaint is evaluated using a "two-pronged approach[.]" *Id.* at 679. First, the court discounts legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]" *Id.* at 678. Second, the court considers whether the factual allegations, taken as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. The court does not "weigh the evidence" or "evaluate the likelihood" that a plaintiff will prevail on his or her claims. *Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 201 (2d Cir. 2017); *see also Kardovich v. Pfizer, Inc.*, 97 F. Supp. 3d 131, 140 (E.D.N.Y. 2015) ("[I]ssues of fact, credibility, and the weight of the evidence are not properly considered on a motion to dismiss[.]").

Defendants argue that BPD officers who did not have personal involvement in Plaintiff's August 25, 2016 arrest and the subsequent criminal prosecution cannot be held liable for claims arising therefrom. The court agrees. *See Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 135 (2d Cir. 2013) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.") (internal quotation marks omitted). Plaintiff

responds to this argument in a footnote, citing his statement of facts in support of his cross-motion for summary judgment as the grounds for opposing Defendants' motion. To the extent his Complaint can be construed as asserting claims arising out of the events on August 25, 2016 against Defendants McDonald and Felschow, Plaintiff did not allege they responded to the incident or participated in charging him. Defendants' motion for judgment on the pleadings dismissing any claims arising out of the August 25, 2016 arrest and prosecution against Defendants McDonald and Felschow for lack of personal involvement is therefore GRANTED.

Defendants further argue that Defendants Wedlake, Hayden, Dickinson, Joshua Heidinger, and Jason Heidinger "played no role in pressing the criminal charges against Plaintiff on August 25, 2016." (Doc. 39-1 at 23.) Because this claim cannot be resolved on the basis of the pleadings, Defendants' motion for judgment on the pleadings with regard to Plaintiff's malicious prosecution claim arising out of his August 25, 2016 arrest must be DENIED.

## II.   Defendants' Motions to Strike.

Defendants move to strike the three affidavits Plaintiff submitted in support of his cross-motion for summary judgment. Although the court denied Plaintiff's cross-motion as untimely, it treated his motion as an opposition to Defendants' motion for summary judgment and agreed to credit Plaintiff's evidence to the extent it was admissible.

At the summary judgment stage, a party may support a factual assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]" Fed. R. Civ. P. 56(c)(1)(A). While the content of the evidence submitted to support or dispute a fact must be admissible, "the material may be presented in a form that would not, in itself, be admissible at trial." *Lee v. Offshore Logistical & Transp., L.L.C.*, 859 F.3d 353, 355 (5th Cir. 2017) (internal quotation marks omitted).[3]

---

[3] *See also Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 238 (3d Cir. 2016) (holding that a "proponent need only 'explain the admissible form that is anticipated'")

Rule 56(c) of the Federal Rules of Civil Procedure affords the opposing party the opportunity to "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). "The objection functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." *Id.* advisory committee's note to 2010 amendment.

## A.   The Koch Affidavit.

Defendants move to strike Plaintiff's reference to the "Koch affidavit[,]" stating that no such document was attached to Plaintiff's cross-motion. Plaintiff does not contend otherwise. The court therefore GRANTS Defendants' motion to strike all Koch affidavit references.

## B.   The Parlato Affidavit.

Defendants argue that the Affidavit of Frank Parlato (the "Parlato Affidavit") should also be struck because it contains inadmissible hearsay and because Plaintiff failed to disclose Mr. Parlato as a witness.[4] Plaintiff responds that because a key witness, Zachary Garlock, has died and can no longer testify, the court should admit the Parlato Affidavit pursuant to the residual hearsay exception under Fed. R. Evid. 807. Plaintiff notes that he "brought up Mr. Parlato's Artvoice articles in each of the [D]efendant officers' depositions[,]" and as a result he contends Defendants should not be surprised

---

(quoting Fed. R. Civ. P. 56 advisory committee's note to 2010 amendment); *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 538 (4th Cir. 2015) (noting that a court may consider "the content or substance of otherwise inadmissible materials where . . . the party submitting the evidence show[s] that it will be possible to put the information . . . into an admissible form") (first and third alterations in original) (internal quotation marks omitted); *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) (determining that a district court may consider a statement "if the statement could be reduced to admissible evidence at trial or reduced to admissible form") (internal quotation marks omitted).

[4] *See* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.").

by the inclusion of the Parlato Affidavit in the record on summary judgment. (Doc. 47 at 8.) Because Mr. Parlato was not disclosed as a witness and Plaintiff has not demonstrated that the failure to do so was substantially justified or harmless, the Parlato Affidavit cannot be "use[d] . . . to supply evidence on [the] motion[.]" Fed. R. Civ. P. 37(c)(1). Even without this obstacle, the Parlato Affidavit would be inadmissible.

Mr. Parlato is an investigative journalist and is the publisher and Editor-in-Chief of Artvoice, a web-based publication that covers Buffalo regional news as well as national and international news. He authored a September 15, 2016 article entitled "Teen Who Ran Against Paladino for School Board in Fight of His Life – Is he Innocent?" (Doc. 44-6 at 2.) As part of his investigation for that article, Mr. Parlato interviewed Zachary Garlock.

Plaintiff seeks to introduce the following statements Zachary Garlock allegedly made to Mr. Parlato:

> I want to recant my statement about [Plaintiff] I made to the police. He [n]ever hit anybody.
>
> When asked why he told the police that [Plaintiff] hit his cousin, he responded:
>
> Because I was coerced by the arresting officers. They wanted to incriminate [Plaintiff]. My statement to the police was under a false name. I said I was Zach Drake. My real name is Zachary Garlock. [Plaintiff] did not get personal in the fight. The police asked me if [Plaintiff] did it and they wouldn't let me see my cousin unless I told them so I said [Plaintiff] did it.
>
> . . .
>
> I was scared. I had warrants against me.

*Id.* at 3-4 (internal quotation marks omitted). The Parlato Affidavit cites the September 15, 2016 article as "a true and accurate reflection" of Zachary Garlock's statements made during that interview. *Id.* at 4.

The "residual exception" to the hearsay rule states that:

> Under the following conditions, a hearsay statement is not excluded by the rule against hearsay even if the statement is not admissible under a hearsay exception in Rule 803 or 804:
>
> (1) the statement is supported by sufficient guarantees of trustworthiness—

after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and

(2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

Fed. R. Evid. 807(a).

"Congress intended that the residual hearsay exceptions will be used very rarely, and only in exceptional circumstances." *Parsons v. Honeywell, Inc.*, 929 F.2d 901, 907 (2d Cir. 1991) (internal quotation marks omitted). "To be admissible pursuant to the residual exception, the evidence must fulfill five requirements: trustworthiness, materiality, probative importance, the interests of justice and notice." *Id.* With regard to probative value, "the evidence must be 'more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts[.]'" *Id.* at 908 (quoting Fed. R. Evid. 803(24)(B)).

In this case, although there is no reason to question Mr. Parlato's integrity or his experience as an investigative journalist, virtually no details regarding his interview of Zachary Garlock are provided. The circumstances of the interview (how it came about; what questions were asked; what other statements Zachary Garlock made, if any; how long the interview lasted; where it took place; and whether other witnesses were present) are not described. The interview is not dated nor is it reflected verbatim in Mr. Parlato's September 15, 2016 article. Instead, only excerpts of it are available. None of the statements were made under oath or were subject to cross-examination. At least one of the statements is demonstrably false.[5]

Mr. Parlato has "since lost the audio recording of [his] conversation with Zachary Garlock" through circumstances that are not described. (Doc. 44-6 at 4.) Although he avers that he "remember[ed] his conversation with Zachary, and the quoted statements are an accurate reflection of [Zachary's] answers to [Mr. Parlato's] questions during his

---

[5] Although Zachary Garlock told Mr. Parlato he provided a false name to BPD officers, it is undisputed that Zachary Garlock identified himself to BPD officers as Brett Garlock's cousin and signed his correct name under oath to his supporting deposition subject to the penalties of perjury.

interview[,]" the Parlato Affidavit was signed over five years after the statements were allegedly made. *Id.*

Plaintiff never obtained an affidavit or deposition from Zachary Garlock adopting the statements contained in the Parlato Affidavit despite an opportunity and incentive to do so. He does not describe his own relationship with Zachary Garlock so as to establish a lack of bias or other motive for Zachary Garlock to provide a false statement.

Because Plaintiff offers no "circumstantial guarantees" that the statements Zachary Garlock made to Mr. Parlato were truthful, a threshold requirement for the application of Rule 803(24) has not been satisfied. *Cf. In re Columbia Sec. Litig.*, 155 F.R.D. 466, 477 (S.D.N.Y. 1994) (finding that when "offered together with . . . testimony, [the] article and accompanying notes possess the 'circumstantial guarantees of trustworthiness' that Rule 803(24) requires").

Zachary Garlock's statements to Mr. Parlato are clearly material because, if true, they would support a claim that BPD officers sought to fabricate evidence to support probable cause to arrest Plaintiff on August 25, 2016. However, even if both Mr. Parlato's version of the events and Zachary Garlock's statements to him were fully credited, they would cast doubt only on Zachary Garlock's August 25, 2016 supporting deposition. The Parlato Affidavit does not mention, much less address, Zachary Garlock's August 31, 2016 recorded and sworn statement to Detective Margaret M. Serafini[6] or his testimony in court wherein he identified Plaintiff as one of Brett Garlock's assailants. These subsequent sworn statements were made at a time when Zachary Garlock was not subject to the coercion which allegedly produced his false accusations on August 25, 2016.

Under applicable law, Zachary Garlock's statements to Mr. Parlato would not

---

[6] When questioned by Detective Serafini on August 31, 2016 in a recorded interview, Zachary Garlock had an opportunity to disavow his allegedly false identification of Plaintiff as an assailant of Brett Garlock on August 25, 2016. He did not do so. To the contrary, he continued to identify Plaintiff as one of Brett Garlock's assailants both verbally and in writing. His sworn statement describes Plaintiff's role in the assault "under penalty of perjury" with notice that the statement would be used as evidence in court. (Doc. 44-3 at 118-20.)

constitute an admissible recantation if offered in the prosecution of Plaintiff for the assault. While not dispositive, this assists in determining whether the Parlato Affidavit should be considered sufficiently trustworthy and "more probative on the point for which it is offered than any other evidence" reasonably available. Fed. R. Evid. 807(a)(2).

Under New York law, "[r]ecantation evidence is considered to be the most unreliable form of evidence." *People v. Jenkins*, 923 N.Y.S.2d 706, 711 (N.Y. App. Div. 2011) (citing *People v. Shilitano*, 112 N.E. 733, 736 (N.Y. 1916)).

> Consideration of recantation evidence involves the following factors:
>
> (1) the inherent believability of the substance of the recanting testimony; (2) the witness's demeanor both at trial and at the evidentiary hearing; (3) the existence of evidence corroborating the trial testimony; (4) the reasons offered for both the trial testimony and the recantation; (5) the importance of facts established at trial as reaffirmed in the recantation; and (6) the relationship between the witness and defendant as related to a motive to lie.

*Id.* (citations omitted).

In the Second Circuit, "[w]hether a valid offer to recant has been made is an issue of law that must be decided by the court." *United States v. D'Auria*, 672 F.2d 1085, 1091 (2d Cir. 1982). "A witness who has lied remains obligated by his oath to tell the truth, without prodding. Unless he admits that he gave false testimony, there is no occasion for recantation." *Id.* at 1092; *see also United States v. Goguen*, 723 F.2d 1012, 1018 (1st Cir. 1983) ("We hold that, for an effective recantation, the [witness] must come forward and explain unambiguously and specifically which of his answers in prior testimony were false and in what respects they were false."). Here, there is no evidence that Zachary Garlock ever offered to recant his three statements under oath. A statement made to a reporter is not an effective recantation under either New York or Second Circuit law. Accordingly, because Zachary Garlock's statements to Frank Parlato would not constitute a true recantation, their probative value is limited.

Because this is not an "exceptional" or "rare[]" circumstance in which the residual exemption to the hearsay rules should apply, *Parsons*, 929 F.2d at 907 (internal quotation marks omitted), Defendants' motion to strike the Parlato Affidavit is GRANTED.

C.    **The Pahl Affidavit.**[7]

Defendants move to strike the Affidavit of Jennifer Pahl (the "Pahl Affidavit") because it is "riddled with hearsay and speculation." (Doc. 46 at 10.) Although Defendants contend Ms. Pahl has not made herself available for deposition, she may still testify at trial absent a court ruling precluding her testimony.[8]

In her affidavit, Ms. Pahl avers that she "witnessed the police question Zachary Garlock outside of 82 Zittel Street" and she "heard Zachary tell the police that Austin Harig had nothing to do with the fight or the assault of Brett Garlock" and that "[i]n subsequent conversations, Zachary admitted to me that [the] police used his intoxication and warrants to coerce a false statement to implicate Austin Harig's involvement in the fight." (Doc. 44-5 at 2-3.)

Plaintiff is correct that Ms. Pahl's recitation of the statement allegedly made by Zachary Garlock to BPD officers is not offered for its truth but is instead offered as information that was available to BPD officers in making their probable cause determination. *See Tuccio v. Papstein*, 307 F. App'x 545, 547 (2d Cir. 2009) (ruling that statements offered to show the information law enforcement had when applying for an arrest warrant were not hearsay because they were not offered for their truth but instead to establish the "then-available information" for the probable cause determination). The court thus does not strike this statement in the Pahl Affidavit.

Plaintiff proffers Zachary Garlock's alleged recantation to Ms. Pahl as a statement against penal interest. However, it is admissible on this basis only if supported by "corroborating circumstances clearly indicate [the] trustworthiness" of the statement. Fed. R. Evid. 804(b)(3)(B) (noting a statement tending to expose the declarant to criminal

---

[7] The Pahl Affidavit misspells Ms. Pahl's last name twice in bold and capitalized font in a three-page document. While Plaintiff apologizes for these errors, he does not explain why Ms. Pahl signed an affidavit with her name repeatedly misspelled.

[8] Ms. Pahl did not provide a statement at the crime scene or to Detective Serafini. Detective Serafini testified that, as a general practice, she does not take sworn statements from intoxicated individuals and that, during her investigation, she believed that Ms. Pahl was intoxicated when she arrived at her interview. Detective Serafini asked her to return when she was sober.

liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement). Plaintiff cites no corroborating circumstances. He does not address the relationship between Ms. Pahl and Zachary Garlock, the relationship between Plaintiff and Zachary Garlock, the timing of the statement, or the circumstances in which the recantation was made. *See United States v. Garcia*, 986 F.2d 1135, 1140 (7th Cir. 1993); *United States v. One Star*, 979 F.2d 1319, 1322 (8th Cir. 1992). He also does not address "the extent to which the declaration is really against the declarant's interest," when made to Ms. Pahl, who was arguably unlikely to report Zachary Garlock's false statement to law enforcement. *United States v. Ospina*, 739 F.2d 448, 452 (9th Cir. 1984). The court must be able to conclude that "a reasonable person in [Zachary Garlock's] position would have made [it] only if [he] believed it to be true because, when made, it . . . had so great a tendency . . . to expose [Zachary Garlock] to civil or criminal liability[.]" Fed. R. Evid. 804(b)(3)(A). Here, the court cannot make such a determination based on the record before it.

In addition, while Zachary Garlock's alleged statement to Ms. Pahl seeks to explain why he purportedly made a false statement to BPD officers on August 25, 2016; it does not explain why he made two additional false statements under oath thereafter. Again, under New York and Second Circuit precedent, the alleged statement does not satisfy the requirements for admissible recantation. Plaintiff, as the proponent of the statement, bears the burden of demonstrating the admissibility of the alleged recantation to Ms. Pahl under Fed. R. Evid. 804(b)(3)(A); he has not sustained that burden.

For the foregoing reasons, Defendants' motion to strike the Pahl Affidavit is GRANTED IN PART AND DENIED IN PART. Ms. Pahl's statements regarding what she heard Zachary Garlock tell BPD officers on August 25, 2016 are admissible not for their truth but for purposes of identifying information provided to BPD as are her personal observations regarding what transpired that night. Ms. Pahl's statement regarding Zachary Garlock's alleged recantation is not.

**D.    Plaintiff's Affidavit.**

Defendants ask the court to disregard Plaintiff's affidavit in its entirety as a "sham

affidavit" because it contradicts his deposition testimony. "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Perma Rsch. & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969). For this reason, "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996). Correspondingly, "where . . . testimony is contradicted by evidence other than the deponent's subsequent affidavit, . . . the concern that the proffered issue of fact is a mere 'sham' is alleviated." *Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38, 43-44 (2d Cir. 2000).

Defendants point to eight statements in Plaintiff's affidavit which they contend are contradicted by his deposition testimony. The court addresses only discrepancies that are material to the summary judgment determination.

### 1.    Whether Plaintiff was Involved in the Assault.

In his affidavit, Plaintiff avers that he "did not participate in th[e] fight, a fact that should have been apparent to the officers before they arrested [him] that night." (Doc. 44-4 at 1.) In his deposition, however, Plaintiff acknowledged that he was involved in the fight on August 25, 2016 and was himself assaulted. When the fight broke out, he testified that he "gave a bear hug to Giovanni [Gandolfo] and pulled him into the living room to attempt to defuse a fight[]" (Doc. 39-5 at 23) and that "Brett [Garlock] had already been hit so he was coming towards me." *Id.* at 24. Plaintiff testified that Brett Garlock was approaching him "[b]ecause he wanted to get Giovanni back[,]" and because "Giovanni was much stronger than [Plaintiff,] he was able to break [away]." *Id.* Plaintiff "attempted to get in between the fighting parties." *Id.* at 25. He was "in the middle of this fight trying to break it up, trying to hold people back," "got hit a couple times [himself] and eventually they just pushed [him] out of the way[,]" and he "got pushed back into [his] living room." *Id.* at 27-28. The court credits Plaintiff's deposition testimony over his

affidavit.

### 2.     Whether Plaintiff Identified the Assailants on August 25, 2016.

In his affidavit, Plaintiff states he "told [the BPD officers] there was a fight, and that the large guys downstairs were the aggressors in the fight, but [he] did not specifically identify the assailants." (Doc. 44-4 at 2, ¶ 7.) His affidavit then appears to contradict this statement by asserting that:

> Tyler Lambert, Giovanni Gandolfo, and Davon Belcher walked away from the scene, and [Plaintiff], along with other individuals on the front porch, told officers that they were the assailants who assaulted Brett. Witnesses on the front porch even pointed them out to officers in an effort to have the thugs arrested who nearly killed [their] friend Brett.

*Id.* at 4-5, ¶ 15.

During Plaintiff's deposition, the following colloquy took place:

> Q. What did you tell them?
>
> A. I told them, yeah, these people fought basically. Brett the guy who got beat up was groping my roommate and her friend, those big guys down there got angry and they basically beat the pulp out of him and I tried to stop it best I could and I'm sorry.

(Doc. 39-5 at 49.)

Because Plaintiff's affidavit does not directly contradict his deposition testimony, the court declines to strike the portion of his affidavit wherein he claims he identified Brett Garlock's assailants to BPD officers on August 25, 2016. The court, however, notes that Plaintiff's affidavit is inconsistent with regard to whether he identified the assailants.

### 3.     When Plaintiff Exited his Apartment.

In his affidavit, Plaintiff asserts:

> 8. While Officers Bannister and Dickinson searched [Plaintiff's] apartment, they found Giovanni Gandolfo and Jennifer Pahl hiding in a bedroom in the attic of the 82 Zittel Street apartment. I told Mr. Gandolfo and Ms. Pahl to come downstairs, and they followed us down.
>
> 9. After we walked downstairs, I sat on the front porch with Jennifer Pahl, Giovanni Gandolfo, Dominique Deane Koch, Tyler Lambert, Davon Belcher, and several other guests present at [Plaintiff's] apartment on August 25, 2016 when the altercation took place.

14

(Doc. 44-4 at 3.)

In his deposition, Plaintiff testified as follows on this same issue:

Q. What happened next?

A. We searched [the apartment] together basically. They brought the flashlight through. We searched the bottom of the apartment. They were like, what's on the attic floor, we want to search that too. I was like there was nothing up there. But they were like, we want to search anyway. So I went up with them.

Q. So you gave police permission to search your apartment?

A. Yes, I did.

Q. At this point you were with the police searching the entire time?

A. Yes.

Q. At that point you were not under arrest?

A. No.

Q. And you were free to move around the apartment?

A. Yes.

Q. Okay. What happened next?

A. We went upstairs. We make it through kind of the corridor upstairs. We get to my bedroom upstairs. Jennifer Pahl and Giovanni are pretending to be asleep in my bed.

Q. So when you entered your bedroom those two people are inside your bedroom?

A. Yes, they ran away I guess.

Q. What happened next?

A. I'm just like, come on, guys, jigs up, come downstairs, tell them your story, why were you hiding in my bed, this is stupid. And the officers are shining their lights at them, come on, come on.

Q. How many police officers were present at that time?

A. Just two.

Q. What happened next?

A. We bring them downstairs. And I go downstairs with them at this point. Actually, no, I didn't immediately go downstairs. Well, I went downstairs into my normal apartment but not down with everyone else. So Jen and Giovanni, they go to the porch. At this point they're convening everyone on

15

my porch.

Q. Who is they?

A. Police. There is like a lot more squad cars at this point.

Q. How many police officers were present at that point?

A. I would have to say maybe eight.

Q. What happened next?

[bathroom break]

Q. So let's back up to where we left off before we took a brief break. You said there was approximately eight police officers on your porch at this point, what happened next?

A. Not all on the porch.

. . .

Q. Okay. What happened next?

A. I stayed upstairs for a minute. I'm just like grappling with what happened. I'm like, oh, my God, they have the police here, they got into this fight. I'm basically mad. I'm angry that I'm having to deal with this situation.

Q. If you were upstairs how do you know that police were gathering people at your porch?

A. Because I looked down when they were bringing Jen and Gio down.

Q. Where did you look down?

A. Down my staircase. I just didn't go with them.

Q. Why didn't you go with them?

A. Because I just wasn't ready yet. I kind of was like, I don't know. First of all, my dog was up there. And she was upset. Her name was Sandy. Second of all, I felt like some conviction to defend my castle at that point. I was like, oh, my God, my house has all of this stuff, all these officers are here, they're dealing with these scumbags who beat up this person. And I was just upset. I was just kind of positioning myself in my house in some sort of self-defense position. Like I was just scared.

Q. What do you mean self-defense position?

A. Like watching, observing, being like, oh, my God.

Q. Was anyone present with you in your apartment at that time?

A. No, at this point everybody had gone downstairs. I was alone.

16

Q. What happened next?

A. After about a minute or two I stopped being so scared. I was like, you know what, my friend got hurt, I need to tell the police what happened so they can arrest the people who did it.

(Doc. 39-5 at 44-49.) The court credits Plaintiff's deposition testimony over his affidavit as to when he exited his apartment.

### 4.    Whether the BPD Officers Questioned the Witnesses.

In his affidavit, Plaintiff avers that he was not asked for his version of the events and that "[a]t no time did Officer McCormick or any of the other officers ask the individuals on the front porch what happened or who participated in the fight." (Doc. 44-4 at 3, ¶ 10.) In his deposition, Plaintiff testified that he asked everyone in his apartment to go downstairs and told "them to own up to their stuff[,]" and when they went downstairs "they talked to some police officers on the way out[.]" (Doc. 39-5 at 36.) Plaintiff went downstairs and was "'just trying to get everyone including [himself] to tell the officers what happened." *Id.* at 51. He testified that the BPD officers did in fact question "everyone" on the front steps:

A female officer, blonde, she came and started interrogating every one individually, not formally, just informally. I can't remember exactly what she was saying. I remember she was asking everyone questions and everybody was saying the same thing. . . . They were saying that Brett groped the girl, Brett was really drunk, Brett did this, Brett did that, and that these people started hitting him because he hit the girl.

*Id.* at 51-52.

With regard to whether Plaintiff himself was questioned, he testified as follows:

Q. So up until this point you hadn't explained to the police officers what had happened?

A. I told the police what happened. But I sent everybody else down to give their parts of the story. I told them, yeah, there was this fight, but they weren't asking me who beat who up, what happened here. I was like, yeah, this happened. I basically explained to them going down when I was walking with the two police officers, I explained it to them very curtly. But they weren't interrogating me or offering to take my statement.

. . .

17

Q. What happened next with regard to you?

A. With regard to me. Well, I ended up telling the police what happened and this old lady officer, fairly old lady, I think she was dirty blonde, she takes me down the stairs. She has a talk with me. She is like, this is crazy, da-duh-da-duh-da.

Q. What's da-duh-da, what did she say?

A. I'm trying to remember. That is why I said that. This is crazy, she was like, you didn't do this but we really want to arrest you.

Q. What was her name?

A. I don't remember. She was an old lady officer, fairly old. That is what I remember from her. She seemed to know who I was too.

. . .

Q. What did you say back to her?

A. I said, you know, I'm so sorry about this, I really didn't mean for it to be this way, I really tried breaking up this fight, you know, these kids are scumbags and I will help you guys in anyway I can. I was just very apologetic. I was just telling her, you know, I'm in shock, I'm so sorry, this won't happen again. I did my best as the renter of the apartment to prevent this fight from happening and give Brett the best medical treatment I could while I waited for 911.

*Id.* at 49, 53-54. The court credits Plaintiff's deposition testimony over his affidavit on the issue of whether BPD officers questioned him and other witnesses.

### 5. Whether Plaintiff Heard BPD Officers' Questioning of Zachary Garlock.

In his affidavit, Plaintiff contends that BPD officers spoke to Zachary Garlock separately for approximately ten to twenty minutes but did not ask if he had been drinking that night. He does not explain how he heard this conversation.

In his deposition, Plaintiff testified that Zachary Garlock was "separated from all of us" and was "on [Plaintiff's] neighbor's front porch" and they were "just interrogating him" while he yelled that he wanted to see his cousin. *Id.* at 55-56. With regard to what he could hear, Plaintiff testified as follows:

Q. How do you know the police officer made him sign a document?

A. Well, I saw them bringing out the document and basically telling him to write. So I saw them bring out this document. I didn't know what it was

18

about. Okay? All I knew was that they were having him sign something.

Q. Did you hear what the police officers said to Zach?

A. Just the part where they're yelling at him about warrants.

Q. Did you hear anything they said with regard to the document they brought out?

A. They were saying my name a couple of times, I heard them.

Q. What happened next?

A. Zach gets put in the ambulance, police come to me. Their demeanor has changed. . . . [Defendant Bannister] handcuffs me, throws me in the back of the cop car.

(Doc. 39-5 at 57-58.) The court credits Plaintiff's deposition testimony over his affidavit regarding what he heard during Zachary Garlock's questioning.

### 6.    Conversation in the Police Cruiser.

In his affidavit, Plaintiff avers that while he was in a police cruiser after his arrest, "[a]fter approximately five minutes of calling out to the officers," BPD Officer Lisa Berndt approached him and he told her: "'You know I didn't do this, right?'" to which she responded: "'We have paperwork.'" (Doc. 44-4 at 5, ¶ 17.) In his deposition testimony, Plaintiff testified as follows:

A. So I'm in the cop car. And basically at this point everybody on my front porch -- so everybody I listed who is still there, they're like, what are you doing, Austin didn't do anything, Austin did not hit Brett, he was trying to help him.

. . .

Q. Did there come a time when you were brought down to a precinct or central booking?

A. Yes, right after that. They sped off with me.

(Doc. 39-5 at 58.)

Because there is no direct conflict between Plaintiff's affidavit and his deposition testimony, the court DENIES Defendants' motion to strike this portion of the affidavit.

In addition to challenging Plaintiff's affidavit under the sham affidavit doctrine, Defendants assert that Plaintiff's affidavit contains inadmissible hearsay statements that must be excluded. For example, Defendants cite Plaintiff's statement that on June 8,

2016, "[e]ach of the three individuals [present] denied smoking marijuana or drinking alcohol that night." (Doc. 44-4 at 7, ¶ 25.) Although Defendants contend this is offered for "the truth of the matter asserted[,]" Fed. R. Evid. 801(c)(2), it is also offered "to show its effect on the listener [and] is not hearsay[]" when offered for that purpose. *United States v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013) ("If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay.") (brackets and internal quotation marks omitted) (quoting Fed. R. Evid. 801(c) advisory committee's note). All other hearsay statements such as the question the grand jury allegedly asked Plaintiff are not material to the outcome of the pending motion.

For the foregoing reasons, Defendants' motion to strike Plaintiff's affidavit is GRANTED IN PART and DENIED IN PART.

### E.   Undisputed Facts Re: Plaintiff's June 8, 2016 Arrest and Prosecution.

During the summer of 2016, Plaintiff rented and resided in the upper unit of 82 Zittel Street, Buffalo, New York, which contains three bedrooms and a living space in the attic. At the time, Plaintiff was approximately eighteen years old.

On June 8, 2016, in the early morning hours, BPD officers, Defendants Anderson, McDonald, and Felschow, responded to a criminal mischief call regarding a stop sign being taken down on Zittel Street. The BPD officers located an individual bringing a stop sign into 82 Zittel Street. Several individuals were present inside the upper unit of the building, including Plaintiff. The occupants appeared to be young. A female informed an officer that she was under the age of twenty-one. The unit "appeared smoky" and had a "pungent marijuana smell." (Doc. 44-7 at 2, ¶ 5.) Officer Anderson observed several marijuana bongs. "Beer cans were everywhere on the ground and in the sink." *Id.*

Defendant Anderson asked the individuals how old they were, whether their parents knew they were there, and where they obtained the alcohol. She took down the names and dates of birth of some of the individuals. One of the occupants was eighteen, and two were seventeen. One of the individuals was holding a Budweiser beer. Defendants Anderson, McDonald, and Felschow did not collect any physical evidence of

alcohol and marijuana consumption, conduct drug or alcohol sobriety tests, or collect supporting depositions from the minors.

Defendant Anderson was the officer in charge and completed Plaintiff's arrest paperwork including the criminal complaint against him.[9] She arrested Plaintiff for providing alcohol to minors and allowing them to smoke marijuana in his apartment. When Defendant Anderson arrested Plaintiff, she did not know whether he had prior arrests.

Defendant Anderson charged Plaintiff with "[u]nlawfully dealing with a child in the first degree" in violation of N.Y. Penal Law § 260.20(2) and criminal nuisance in the second degree in violation of N.Y. Penal Law § 240.45(2). She completed the corresponding paperwork and "signed the accusatory instruments." (Doc. 44-7 at 3, ¶ 9.)

The case against Plaintiff based on his June 8, 2016 arrest was placed on the reserve calendar after Assistant District Attorney Michael Smith informed the court that an officer was having difficulty finding the witnesses for whom they had names and addresses to complete supporting depositions. Plaintiff and his counsel attended an August 1, 2016 criminal proceeding before a City Court Judge. The charges against Plaintiff were ultimately dismissed.

### F.    Disputed Issues of Fact Re: Plaintiff's June 8, 2016 Arrest and Prosecution.

Defendants contend that the BPD officers tried to interview the individuals who were present at Plaintiff's apartment, several of whom appeared intoxicated. When asked if they were drinking alcohol, these individuals answered in the affirmative and indicated that Plaintiff had furnished the alcohol to them by having other people purchase it for him.

In his affidavit, Plaintiff asserts that he did not give alcohol to anyone that night,

---

[9] A "City of Buffalo Police Department Central Booking Bureau Case History" form listed Defendant Anderson as the "Officer in Charge of the Case" and thus "the officer with the most knowledge of the events leading to the arrest[]" and states that "[t]his officer will also be the one to submit all items of an evidentiary nature to the CPS lab or property room." (Doc. 44-3 at 105) (capitalization omitted).

nor did he let any of his guests smoke marijuana in his apartment. He claims that when questioned by BPD officers, the minors denied smoking marijuana or drinking alcohol and denied he provided it to them. He does not dispute, however, that the minors, alcohol, and marijuana were present in his apartment at the time of his arrest.

### G. Undisputed Facts Re: Plaintiff's August 25, 2016 Arrest and Prosecution.

On August 24-25, 2016, various individuals, including Zachary Garlock and Brett Garlock, attended a party at Plaintiff's apartment located at 82 Zittel Street. At some point during the night, a fight broke out between Davon Belcher, Tyler Lambert, Giovanni Gandolfo, and Brett Garlock in Plaintiff's living room. Zachary Garlock joined the altercation as the group moved toward the door, out of the unit, and into the hallway. Plaintiff became involved in the fight until he was pushed aside. The fight continued, and at some point, Zachary Garlock and Brett Garlock were pushed down the stairs. Brett Garlock, whose face was bloody and who appeared unconscious, was moved to the front porch.

While Plaintiff was waiting for first responders to arrive, Tyler Lambert ran down the stairs and kicked Brett Garlock. Jonathan Tyner told the assailants "[Brett] is done" and to go back upstairs. (Doc. 46-1 at 9-10) (brackets in original) (internal quotation marks omitted).

At approximately 2:30 a.m., BPD officers, including Defendants Hayden, Dickinson, Joshua Heidinger, Jason Heidinger, Wedlake, Bannister, Keaton, and Sullivan, responded to 82 Zittel Street in response to a 911 call. When they arrived, Defendants Keaton and Bannister encountered Brett Garlock, whose eyes were swollen shut and who had a head laceration. He was also bleeding from his mouth and coughing up blood. Brett Garlock was unable to answer questions. Officer Keaton called for an ambulance.

The BPD officers attended to Brett Garlock and attempted to speak with those present. Defendants Hayden and Wedlake "held the scene." (Doc. 44-7 at 6, ¶ 18.)

After arresting Jonathan Tyner, Defendant Bannister asked Plaintiff if he could

22

search Plaintiff's apartment. Plaintiff consented and requested Defendant Bannister to bring Defendant Dickinson with him. After they entered his apartment, Plaintiff told Defendants Bannister and Dickinson that "those big guys down there" assaulted Brett Garlock but he did not specifically identify the assailants at that time. (Doc. 46-1 at 12, ¶ 22) (internal quotation marks omitted). Defendants Bannister and Dickinson continued to search Plaintiff's apartment and found Giovanni Gandolfo and Ms. Pahl hiding upstairs pretending to be asleep. Plaintiff told Mr. Gandolfo and Ms. Pahl to go downstairs and give their account of the fight to the BPD officers. Defendant Keaton observed blood on Giovanni Gandolfo's hands and pointed this out to him as consistent with his involvement in the fight. Giovanni Gandolfo was not arrested that night; however, he was arrested later and ultimately found guilty for his role in the altercation. Plaintiff stayed upstairs alone in his apartment but eventually came downstairs and joined the other witnesses on his front porch.

The BPD officers asked the individuals on the front porch to provide their names and addresses. They also questioned the witnesses and Plaintiff about the fight.

Defendant Keaton asked Zachary Garlock who was involved in the fight, and while he would not directly point out anyone, he completed a supporting deposition in Defendant Keaton's presence, stating: "My cousin got roughed up, I tried to protect him, Austin threw me down the stairs. He was fighting my cousin [B]rett." (Doc. 39-7 at 5.) The supporting deposition indicates law enforcement's intent to offer the statement as evidence at trial and contains the following warning: "NOTICE: False statements made herein are punishable as a Class A Misdemeanor pursuant to Section 210.45 of the New York State Penal Law." *Id.* Zachary Garlock signed the supporting deposition using his correct name. BPD officers observed that Zachary Garlock had scrapes on his back at the time.

BPD officers arrested Plaintiff based upon Zachary Garlock's supporting deposition. Defendants Keaton and Bannister prepared the arrest paperwork. Defendant Bannister signed the accusatory instruments. Plaintiff was charged with gang assault in the first degree in violation of N.Y. Penal Law § 120.07, assault in the third degree in

violation of N.Y. Penal Law § 120.00(1), and harassment in the second degree in violation of N.Y. Penal Law § 240.26(1). No member of the BPD physically injured Plaintiff during his arrest. During the booking process, Plaintiff told a BPD officer that he was not in the fight, to which Defendant Bannister responded, "We have paperwork." (Doc. 44-4 at 5, ¶ 17.)

Detective Serafini was assigned to investigate the assault on August 25, 2016. On or about August 30, 2016, she issued a "Be on the Lookout" for Zachary Garlock, which advised BPD officers that he was a witness to a gang assault at 82 Zittel Street, had a warrant for his arrest, and was avoiding law enforcement. The "Be on the Lookout" was eventually cancelled after Detective Serafini interviewed Zachary Garlock on August 31, 2016. During that interview, Zachary Garlock provided a sworn written statement accompanied by the same notice regarding the potential penalties for making a false statement. In that statement, he stated in his "own words" what happened on August 25, 2016 at approximately 2:25 a.m. at 82 Zittel Street:

> We were all drinking. I don't remember how the argument started. But when I did realize what was going on Davon [Belcher] and Brett [Garlock] were fighting. Then Tyler Lambert jumped into the fight. There were two other people that jumped in right after Tyler. I don't know their names. Then when Brett [Garlock] became unconscious we were at the top stairwell. I remember pulling Austin Harig off of Brett [Garlock]. When I intervened that's when someone grabbed me from behind and threw me down the stairs. I rolled to the bottom of the stairs and had a seizure.

(Doc. 44-3 at 118.) Zachary Garlock further stated that he saw Davon Belcher "[p]unch Brett [Garlock] at first then saw him kick Brett while he was down and unconscious[]" and this assault took place "[i]n Austin's apartment and in the upstairs stairwell." *Id.* at 119. He saw Tyler Lambert do the "[s]ame exact thing." *Id.* He was asked the following questions about Plaintiff's involvement in the altercation and responded as follows:

> Q. What did you see Austin [Harig] do if anything?
>
> R. I saw Austin [Harig] over him punching him when Brett [Garlock] was in the stairwell.
>
> Q. Do you remember anything else regarding the fight?
>
> R. No.

24

Q. Do you remember talking to the police the night of the fight?

R. Yes.

Q. Did you identify any persons that assaulted Brett [Garlock]?

R. Yes, Austin Harig. [I] would have identified the others but [I] didn't see them there.

Q. You stated you were drinking that night, correct?

R. Yes.

Q. Were you aware of what was going on even though you had been drinking?

R. Yes.

Q. Is there anything else you would like to add regarding this incident?

R. No.

Q. Are you giving me this statement of your own free will?

R. Yes.

Q. Were you treated fairly by the Buffalo Police today?

R. Yes.

*Id.* at 119-20.

On September 1, 2016, Zachary Garlock testified in a criminal proceeding and was subject to cross-examination regarding the August 25, 2016 assault. He identified Plaintiff's apartment as the location of a party and stated that his "cousin Brett [Garlock] was up against the door and a little argument did come about with someone, some other person [than] D[a]von, and they started getting a little physical. Next thing I realized was that another person, Tyler [Lambert], was getting physical with my cousin Brett." *Id.* at 131. Zachary Garlock testified that Tyler Lambert and another individual were punching Brett "[i]n the head [and] chest" and "[h]e got knocked through the door, at this point he became unconscious, Brett [Garlock] became unconscious[]" and "[a]t this point Austin [Harig] was punching him as the others were kicking and punching him . . . in the back of the head and neck area" while "Tyler Lambert and Davon Belcher, they were kicking him in the back of the head." *Id.* at 133-34.

In response to cross-examination by Plaintiff's criminal defense attorney, Zachary

Garlock testified that there were "at least fifteen people" at the party, most of whom were friends of his, and that, at some point, he was thrown down the stairs. (Doc. 44-3 at 135.) He testified that he saw the altercation involving his cousin from "maybe a good ten feet away—maybe not even, maybe five." *Id.* at 136. When he tried to assist his cousin, he testified that "[t]hat's when I saw Austin [Harig], everybody actually, just pouncing on him. That's when I tried to intervene, when I got close, somebody came behind me, I hit the wall and rolled down the stairs." *Id.* at 138. He identified "everybody" as "D[a]von [Belcher], Tyler [Lambert,] and Austin [Harig]." *Id.* He also testified that on the night in question he "drank a little vodka[,]" which he defined as "[m]aybe a quarter of a bottle. Quarter of a liter, a liter[,]" which he consumed "fairly quick, maybe 15 minutes" prior to the altercation. *Id.* at 140. On redirect, he reiterated that he saw Plaintiff and the others attacking his cousin Brett Garlock before he was thrown down the stairs.

Brett Garlock also testified in court and was subject to cross-examination. He recalled being at Plaintiff's apartment for a party, he recalled being assaulted, he could remember "a gentleman, not Austin [Harig], taking a swing at me and that is all I remember from that night." *Id.* at 143. He was hospitalized in the intensive care unit for three days and suffered a "concussion, broken nose, two broken orbitals and a cut on [his] lip, and [he] also had a tooth knocked out." *Id.* He testified that he did not know whether Plaintiff had struck him.

Jonathan Tyner was called as a witness by Plaintiff's counsel and testified that he attended the party but did not consume any alcohol or drugs. Although he could not identify any of the four assailants who attacked Brett Garlock, he stated that Plaintiff tried to prevent the altercation by getting between Brett Garlock and his assailants. On cross-examination, he admitted that there were seven people between his location and where Brett Garlock was attacked but he was less than ten feet away and could see two people strike Brett Garlock. He testified that Plaintiff did not leave his apartment until everyone was outside. Mr. Tyner testified that he tried to stop the four assailants from continuing the assault and remained in Plaintiff's dining room when the assault continued in the stairwell. He testified that when he and Plaintiff were arrested, he told the BPD

officer that Plaintiff was not involved.

The presiding judge described the testimony at the criminal proceeding as a credibility contest between a witness who had consumed alcohol, Zachary Garlock, which "would have some effect on anybody who drinks that quantity by itself," and Jonathan Tyner, who might be "bias[ed]" but "who had not ingested anything, had not drank anything, and so we have a person perhaps with a clearer head observing what takes place" and found "there's a disagreement as to what . . . [Mr. Harig's] role was." (Doc. 44-3 at 167-68.) The judge indicated he would review the transcript and rule on a later date.

Plaintiff was required to attend court proceedings before the charges against him were eventually "no billed" by a grand jury.

### H.     The Disputed Facts re: Plaintiff's August 25, 2016 Arrest and Prosecution.

Plaintiff asserts that when officers arrived on August 25, 2016, he was sitting on his front porch attending to Brett Garlock. Defendants dispute Plaintiff's location upon their arrival, but acknowledge that Brett Garlock was on the bottom porch steps near the sidewalk and lawn. Plaintiff contends that when they approached him, Defendants Bannister, Keaton, and Dickinson were screaming his name. Defendants deny they were screaming at him.

After all the guests were asked to exit Plaintiff's apartment, the parties dispute who was present on the front porch during the officers' questioning. Plaintiff contends that the BPD failed to separate the witnesses for questioning. Defendants counter that these individuals "refused to cooperate or provide . . . information[]" beyond providing their names and other identifying information. (Doc. 46-1 at 13, ¶ 25.) Defendants further contend that they asked Plaintiff what happened, they took notes of that conversation, and Plaintiff did not identify any of the assailants.

Plaintiff contends that upon Defendant Keaton's observation that Giovanni Gandolfo had blood on his hands, he told her that the blood was "from sleeping[.]" *Id.* at 14, ¶ 26. He further states that Defendant Keaton did not question Giovanni Gandolfo

further. Defendants respond that Giovanni Gandolfo refused to cooperate when
Defendant Keaton attempted to question him further.

Plaintiff asserts that while Defendants Bannister and Keaton drove Jonathan Tyner
and Plaintiff to booking, Jonathan Tyner told the arresting officers that Plaintiff was not
involved in the fight and said, "You know this kid didn't do anything, right? I don't know
why you are arresting him." *Id.* at 18, ¶ 36 (internal quotation marks omitted). Defendants
dispute that Jonathan Tyner stated that Plaintiff was not involved.

## III.   Conclusions of Law and Analysis.

### A.   Standard of Review.

Summary judgment must be granted when "there is no genuine dispute as to any
material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.
56(a). "A fact is 'material' . . . if it 'might affect the outcome of the suit under the
governing law.'" *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 39 (2d Cir. 2015)
(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A dispute of fact is
'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the
nonmoving party.'" *Id.* at 39-40 (quoting *Anderson*, 477 U.S. at 248). The court
"constru[es] the evidence in the light most favorable to the nonmoving party and draw[s]
all reasonable inferences in his favor." *McElwee v. Cnty. of Orange*, 700 F.3d 635, 640
(2d Cir. 2012).

The moving party always "bears the initial responsibility of informing the district
court of the basis for its motion, and identifying those portions of the pleadings,
depositions, answers to interrogatories, and admissions on file, together with the
affidavits, if any, which it believes demonstrate the absence of a genuine issue of material
fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks
omitted). When the moving party has carried its burden, its opponent must produce
"sufficient evidence favoring the nonmoving party for a jury to return a verdict for that
party." *Anderson*, 477 U.S. at 249. "A non-moving party cannot avoid summary
judgment simply by asserting a 'metaphysical doubt as to the material facts.'" *Woodman*

*v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

"The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (internal quotation marks omitted). However, "[t]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (internal quotation marks omitted). A mere "scintilla of evidence" in support of the nonmoving party is insufficient; "there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (internal quotation marks omitted).

Although there are disputed issues of fact, not all factual disputes are material. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). In this case, none of the disputed facts are material for several reasons.

First, facts gleaned after an arrest are not material to Plaintiff's false arrest claims because they cannot supply or defeat probable cause as that determination must be based upon the facts known or knowable at the time of the arrest. *See Florida v. Harris*, 568 U.S. 237, 249 (2013) (observing that courts must "not evaluate probable cause in hindsight, based on what [further investigation] does or does not turn up"); *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) ("When determining whether probable cause exists courts must consider those facts *available to the officer* at the time of the arrest and immediately before it, as probable cause does not require absolute certainty.") (citation and internal quotation marks omitted); *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997) (observing that facts that are subsequently discovered, whether they tend to support or negate the existence of probable cause, are irrelevant to a false arrest claim).

Second, a law enforcement officer is not required to perform a perfect investigation in order to establish probable cause. As a result, facts related to the quality of Defendants' investigation, such as their alleged failure to separate witnesses, ask certain questions, or arrest all of the participants potentially involved in a suspected crime, do not affect the probable cause determination with regard to Plaintiff's arrests. *See Rae v. Cnty. of Suffolk*, 693 F. Supp. 2d 217, 225 (E.D.N.Y. 2010) ("While, in hindsight, it may be that [the arresting officer] could have asked additional questions, or conducted a fuller investigation, the role of the court is not to overly scrutinize the decisions of police officers from its vantage in chambers, long after those decisions were made, but to determine whether the officers acted reasonably and in compliance with what the law requires based on what they knew at the time.").

Third, "the probable cause standard does not require that the arresting officer affirmatively seek out reasons to doubt the victim or a witness where none are apparent." *Rae*, 693 F. Supp. 2d at 224 (internal quotation marks omitted); *Stansbury v. Wertman*, 721 F.3d 84, 91 (2d Cir. 2013) (observing that arresting officer "had no reason to doubt the honesty" of two witnesses, "each of whom made statements under penalty of perjury and lacked incentive to single out [plaintiff] as the perpetrator"); *see also United States v. Hernandez*, 85 F.3d 1023, 1028 (2d Cir. 1996) (ruling that the court affords greater weight when witnesses testify or swear "under threat of the criminal sanction for perjury"). Instead, "an arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with the crime, has probable cause to effect an arrest absent circumstances that raise doubts as to the victim's veracity." *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995). "Indeed, the 'uncorroborated testimony of a victim or other percipient witness' is usually sufficient on its own to support a finding of probable cause." *United States v. Barbosa*, 2016 WL 3976559, at *4 (D. Mass. July 22, 2016) (quoting *Acosta v. Ames Dep't Stores, Inc.*, 386 F.3d 5, 10 (1st Cir. 2004)). This is because "[a] victim is considered a 'reliable informant' even if 'his or her reliability has not theretofore been proved or tested.'" *Id.* (quoting *Nelson v. Moore*, 470 F.2d 1192, 1197 (1st Cir. 1972)).

Finally, although Plaintiff argues that Zachary Garlock was intoxicated when he provided his sworn statement to BPD officers on August 25, 2016 and was advised of an outstanding arrest warrant when questioned, neither fact required BPD officers to reject Zachary Garlock's sworn statement as unreliable. *See United States v. Frezzell*, 793 F. App'x 133, 136 (3d Cir. 2019) ("It long has been recognized that a witness is not rendered incompetent to testify merely because the witness was under the influence of drugs at the time of testifying. A witness under the influence of drugs is competent to testify unless he or she is so impaired that he or she cannot coherently respond to questioning.") (internal quotation marks and brackets omitted); *White v. Town of Marblehead*, 989 F. Supp. 345, 350 (D. Mass. 1997) (rejecting the proposition that a complaining victim's intoxicated state "should have triggered doubts on the part of the responding officers"). In this case, it is undisputed that Zachary Garlock was able to answer BPD officers' questions and write out a sworn statement. Although he may have been advised of the warrants for his arrest, a truthful statement that he could be arrested does not constitute illegal coercion.[10]

Because the disputed issues of fact do not affect the outcome of the probable cause analysis, they do not preclude summary judgment if it is otherwise appropriate. *See Rodriguez*, 788 F.3d at 39 (observing that a fact is "material" only if it affects the "outcome of the suit" under applicable law).

### B.    Whether Defendants are Entitled to Qualified Immunity with regard to Plaintiff's False Arrest and Malicious Prosecution Claims.

Defendants assert that the individual officers are entitled to qualified immunity with regard to Plaintiff's false arrest and malicious prosecution claims because either probable cause or arguable probable cause supported Plaintiff's June 8, 2016 and August 25, 2016 arrests and criminal prosecutions.

---

[10] *See United States v. Ortiz*, 943 F. Supp. 2d 447, 456 (S.D.N.Y. 2013) (holding that "a threat [to arrest] does not render a confession involuntary *if* the police have probable cause to arrest . . . and thus could lawfully carry out the threat") (emphasis in original).

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). Although on summary judgment the "facts are viewed in the light most favorable" to the nonmoving party, when a "case concerns the defense of qualified immunity, . . . the [c]ourt considers only the facts that were knowable to the defendant officers." *White v. Pauly*, 137 S. Ct. 548, 550 (2017) (citations omitted).

> Two questions inform qualified immunity analysis. First, do the facts show that the officer's conduct violated plaintiff's constitutional rights? If the answer to this question is no, further inquiry is unnecessary because where there is no viable constitutional claim, defendants have no need of an immunity shield. But if the answer is yes, or at least not definitively no, a second question arises: was the right clearly established at the time of defendant's actions?

*Zalaski v. City of Hartford*, 723 F.3d 382, 388 (2d Cir. 2013).

"Probable cause is a complete defense to a constitutional claim of false arrest[] . . . [a]nd continuing probable cause is a complete defense to a constitutional claim of malicious prosecution." *Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014) (internal quotation marks and citations omitted).

> [I]n general probable cause to arrest exists when the officers have knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested. Probable cause may also exist where the officer has relied on mistaken information, so long as it was reasonable for him to rely on it. However, the failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause. The existence of probable cause must be determined by reference to the totality of the circumstances.

*Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010) (internal quotation marks and citations omitted) (alteration adopted).

"[S]pecifically, probable cause exists if a law enforcement officer received information from some person, normally the putative victim or eyewitness, unless the circumstances raise doubt as to the person's veracity. The reliability or veracity of the

informant and the basis for the informant's knowledge are two important factors." *Betts*, 751 F.3d at 82 (internal quotation marks and citation omitted) (alteration adopted). "When determining whether probable cause exists, courts must consider those facts *available to the officer* at the time of the arrest and immediately before it, as [p]robable cause does not require absolute certainty." *Panetta*, 460 F.3d at 395 (alteration in original).

In the absence of actual probable cause, an officer may be entitled to qualified immunity based on "arguable probable cause." *See Ackerson v. City of White Plains*, 702 F.3d 15, 21 (2d Cir. 2012) (internal quotation marks omitted). Arguable probable cause "exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Zalaski*, 723 F.3d at 390 (internal quotation marks omitted). In undertaking this analysis, "judges should be cautious about second-guessing a police officer's assessment, made on the scene," "[w]ith the benefit of hindsight and calm deliberation[.]" *Ryburn v. Huff*, 565 U.S. 469, 477 (2012); *see also Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003).

### 1.   Whether There was Probable Cause or Arguable Probable Cause for Plaintiff's June 8, 2016 Arrest and Criminal Prosecution.

Defendants argue that Plaintiff's June 8, 2016 arrest was supported by probable cause or arguable probable cause because Plaintiff committed a misdemeanor in the BPD officers' presence. It is undisputed that prior to Plaintiff's arrest, BPD officers were investigating the unlawful removal of a stop sign which was brought into Plaintiff's apartment. When BPD officers proceeded to Plaintiff's apartment to investigate further, inside his apartment, they smelled marijuana, Defendant Anderson observed several marijuana bongs, and "[t]here [were] beer cans everywhere[]" and one of the individuals was holding a beer. (Doc. 39-8 at 31.) Defendant Anderson interviewed the individuals present and determined that at least some of them were minors.

Under New York law,

> A person is guilty of unlawfully dealing with a child in the first degree
> when: 1. He knowingly permits a child less than eighteen years old to enter
> or remain in or upon a place, premises or establishment where . . . activity
> involving controlled substances . . . is maintained or conducted, and he
> knows or has reason to know that such activity is being maintained or
> conducted[.]

McKinney's Penal Law § 260.20. "There is no express requirement that the defendant
know the person was [a minor]." *Id.*, Statutory History, Unlawful Dealing, First Degree
(collecting cases).

Although Plaintiff argues that he did not "knowingly" maintain the premises for
the purpose of drinking alcohol or smoking marijuana, his presence at his apartment
while marijuana and alcohol were consumed by at least one minor was sufficient to
provide probable cause or, in the alternative, arguable probable cause for his arrest. *See
Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause
to believe that an individual has committed even a very minor criminal offense in his
presence, he may, without violating the Fourth Amendment, arrest the offender."); *cf.
United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006) (observing that "the smell of
marijuana alone, if articulable and particularized, may establish not merely reasonable
suspicion, but probable cause").

When BPD officers arrived at his apartment, Plaintiff was awake and present
where "activity involving controlled substances" was being "conducted[.]" He concedes
that he knew minors had entered and remained in his apartment. The smell of
marijuana,[11] drug paraphernalia, and beer cans provided further evidence of criminal
activity. Collectively, the facts were sufficient for probable cause. *See People v. Diaz*, 24
N.Y.3d 1187, 1188-90 (N.Y. 2015) (holding that the defendant had "reason to know" that
there was "drug activity" taking place in her apartment where, despite co-defendant's
claim that the "narcotics belonged to him[,]" controlled substances and paraphernalia
were in plain sight, defendant was the leaseholder, and she was present in the apartment

---

[11] Although in 2021 the New York Legislature legalized the use of marijuana, it did so only for
persons twenty-one years of age or older. Marijuana was not legal in New York in June of 2016.

in her "bedroom attire" and was aware that "her three children [and] her 10-year-old
niece . . . were [also] present").

Because Plaintiff appeared to violate § 260.20(1) in their presence, BPD officers
had probable cause to arrest him. It matters not that Plaintiff was ultimately charged with
a violation § 260.20(2) for providing alcohol to a person less than twenty-one years old.[12]
"[A] claim for false arrest turns only on whether probable cause existed to arrest a
defendant, and . . . it is not relevant whether probable cause existed with respect to each
individual charge, or, indeed, any charge actually invoked by the arresting officer at the
time of arrest." *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006) (citing *Devenpeck v.
Alford*, 543 U.S. 146, 153 (2004)). "Stated differently, when faced with a claim for false
arrest, [the court must] focus on the validity of the *arrest*, and not on the validity of each
charge." *Id.* (emphasis in original).

Because Plaintiff's June 8, 2016 arrest was supported by either probable cause or
arguable probable cause, his false arrest claim fails as a matter of law. *See Jaegly*, 439
F.3d at 154 ("We thus hold, following *Devenpeck*, that a plaintiff is not entitled to
damages under § 1983 for false arrest so long as the arrest itself was supported by
probable cause, regardless of whether probable cause supported any individual charge
identified by the arresting officer at the time of the arrest."). Defendants' motion for
summary judgment with regard to Plaintiff's false arrest claim arising out of the June 8,
2016 incident (Count II) is therefore GRANTED.

To establish his malicious prosecution claim pertaining to his June 8, 2016 arrest,
Plaintiff must establish: "(1) the initiation or continuation of a criminal proceeding
against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of

---

[12] "Courts have held that liability under subdivision two [of § 260.20] may extend even to a
person who is less than 21 years of age who sells or gives alcohol to another person who is less
than 21 years of age." McKinney's Penal Law § 260.20, Statutory History, Unlawful Dealing,
Second Degree (collecting cases); *see also Rust v. Reyer*, 693 N.E.2d 1074, 1077 (1998)
(construing civil penalty statute and observing that "[t]o interpret 'furnishing' as [defendant]
suggests—in effect limiting it to those who hand the alcohol to the minor—gives the term an
overly narrow reach that undermines the clear legislative goal").

probable cause for commencing the proceeding; and (4) actual malice as a motivation for the defendant's actions." *Dettelis v. Sharbaugh*, 919 F.3d 161, 163-64 (2d Cir. 2019). A § 1983 malicious prosecution claim also requires "a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 216 (2d Cir. 2000).

When examining a malicious prosecution claim, probable cause continues unless "the groundless nature of the charges [is] made apparent by the discovery of some intervening fact." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996). A court must therefore consider, "between the time of the arrest" and "arriv[al] at the police station" when an individual is "actually charged[,]" whether the officer "received information that was sufficient to eliminate probable cause as to any of the crimes charged." *Id.*

Although Plaintiff has established the initiation of a criminal proceeding against him and its termination in his favor, he does not establish the remaining elements of his malicious prosecution claim. There are no intervening facts which altered the probable cause analysis after his arrest. It was not lack of probable cause but the inability to secure witness testimony which resulted in the termination of the criminal proceedings in Plaintiff's favor. In addition, Plaintiff proffers no evidence of actual malice. Defendants' motion for summary judgment on Plaintiff's malicious prosecution claim (Count I) must therefore be GRANTED.

> **2.      Whether There was Probable Cause or Arguable Probable Cause for Plaintiff's August 25, 2016 Arrest and Criminal Prosecution.**

Defendants argue they are entitled to summary judgment with regard to Plaintiff's false arrest and malicious prosecution claims relating to the August 25, 2016 incident because Plaintiff's arrest was supported by probable cause based on Zachary Garlock's sworn statement indicating that Plaintiff had assaulted Brett Garlock and probable cause continued thereafter based on two additional sworn statements provided by Zachary Garlock, a putative victim in the assault. Plaintiff counters that a supporting deposition

36

from an unreliable, intoxicated witness does not provide probable cause to arrest and continuing probable cause for a prosecution when there was ample evidence from other sources of Plaintiff's innocence.

When BPD officers arrived at Plaintiff's apartment at approximately 2:30 a.m., Plaintiff was in close proximity to Brett Garlock, who was severely injured. BPD officers questioned Zachary Garlock, who provided a sworn statement that Plaintiff was one of his cousin's assailants. At the time, Zachary Garlock had scrapes on his back consistent with his involvement in a physical altercation. Although Plaintiff points out that Zachary Garlock later testified that he had consumed a quarter liter of vodka fifteen minutes before the altercation, "intoxication alone cannot cast doubt on his story." *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001). Plaintiff's only admissible evidence of coercion is that officers knew of Zachary Garlock's arrest warrant but chose not to arrest him.[13] Even if Defendants used Zachary Garlock's outstanding arrest warrant as leverage to encourage his cooperation, this itself was not unlawful in light of their right to arrest him. *See United States v. Ortiz*, 943 F. Supp. 2d 447, 456 (S.D.N.Y. 2013).

Plaintiff points out that other individuals at the scene told BPD officers he was not involved. However, "some exculpatory evidence does not make an arrest illegal when the totality of evidence still establishes probable cause to believe that the suspect committed the crime." *Stansbury*, 721 F.3d at 94; *see also Holder v. Town of Sandown*, 585 F.3d 500, 505 (1st Cir. 2009) (rejecting "the proposition that a police officer has a standing obligation to investigate possible defenses or resolve conflicting accounts prior to making an arrest"). Likewise, Plaintiff's claim that he was a peacemaker and not an aggressor is not dispositive. *See Jocks v. Tavernier*, 316 F.3d 128, 135-36 (2d Cir. 2003) ("We did not impose a duty on the arresting officer to investigate exculpatory defenses offered by the

---

[13] Although Plaintiff contends that Defendant Bannister testified in deposition that "he told [Zachary] Garlock he would ignore his [warrant] in return for his cooperation in providing a statement identifying the individuals who assaulted Brett Garlock[,]" (Doc. 44-8 at 8, ¶ 28), Defendant Bannister merely stated that the extent of his discussion about Zachary Garlock's warrant was "to the effect of, I don't care about your warrant at this time. I'm here for your cousin." (Doc. 44-3 at 96.)

person being arrested[.]"). This is because "the fact that an innocent explanation may be consistent with the facts alleged does not negate probable cause, and an officer's failure to investigate an arrestee's protestation of innocence generally does not vitiate probable cause." *Panetta*, 460 F.3d at 395-96 (citation, internal quotation marks, and ellipses omitted). Probable cause requires only "a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983). Here, the undisputed facts, even when regarded in the light most favorable to Plaintiff, satisfy the standard for probable cause or, in the alternative, arguable probable cause for Plaintiff's arrest for participating in the fight.

Although other investigative techniques may have been available to determine the degree of Plaintiff's participation, "[o]nce a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Curley*, 268 F.3d at 70 (quoting *Ricciuti*, 124 F.3d at 128). This is especially true when law enforcement is confronted with a chaotic scene during the early morning hours, is presented with conflicting accounts of a life-threatening assault, and is sorting through the varying accounts provided by uncooperative witnesses who may have themselves participated in the crime. Rather than view that mix of facts with the benefit of hindsight, based on the evidence presented to the BPD officers at the time of Plaintiff's August 25, 2016 arrest, the court can easily conclude that "officers of reasonable competence could disagree on whether the probable cause test was met." *Zalaski*, 723 F.3d at 390 (internal quotation marks omitted). As a result, summary judgment must be GRANTED in Defendants' favor on Plaintiff's false arrest claim arising out of his August 25, 2016 arrest (Count VII).

With regard to his malicious prosecution claim arising from that same event, Plaintiff claims that BPD officers deliberately disregarded exculpatory facts, including that multiple individuals protested Plaintiff's arrest and told officers he was not involved in the fight. Plaintiff asserts Defendants Bannister and Keaton failed to document this

information and, as a result, withheld exculpatory evidence from the prosecutor. He does not, however, proffer any evidence in support of this claim.

"[U]nder some circumstances, a police officer's awareness of the facts supporting a defense can eliminate probable cause." *Jocks*, 316 F.3d at 135. The present case is not among them. After Plaintiff's arrest, BPD officers obtained a second sworn statement from Zachary Garlock detailing Plaintiff's role in the assault. At the time of this second statement, there is no evidence that Zachary Garlock was intoxicated or subject to any coercion. Thereafter, after the charges were filed against Plaintiff, Zachary Garlock testified under oath that Plaintiff was one of his cousin's assailants. He maintained this claim on cross-examination. Plaintiff does not claim Zachary Garlock was intoxicated at the time of this testimony, nor does he claim that this testimony was the product of coercion. Neither of Zachary Garlock's subsequent sworn statements "eliminate[d] probable cause as to any of the crimes charged." *Lowth*, 82 F.3d at 571.

The judge who presided over Plaintiff's criminal case advised the parties that he needed to weigh Zachary Garlock's testimony and concession that he had consumed alcohol on the night of the assault against that of Jonathan Tyner, who claimed under oath not to have been under the influence of alcohol or drugs at the time and who claimed Plaintiff was not an aggressor in the fight. The prosecution against Plaintiff was eventually terminated when the grand jury "no billed" the charges.

Although Plaintiff can establish that a criminal proceeding was initiated against him and terminated in his favor, he cannot establish any other element of his malicious prosecution claim. Zachary Garlock's sworn statements to Detective Serafini and his testimony in the criminal proceedings provided continuing probable cause for a criminal prosecution, and Plaintiff has not established that Defendants acted with actual malice in relying upon them.

Because Plaintiff has failed to proffer admissible evidence in support of each essential element of his claim, Defendants' motion for summary judgment with regard to Plaintiff's malicious prosecution claim arising out of his August 25, 2016 arrest (Count VI) must therefore be GRANTED. *See Celotex Corp.*, 477 U.S. at 322 (requiring grant of

summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case[]"); *see also El-Nahal v. Yassky*, 835 F.3d 248, 252 (2d Cir. 2016) (holding that "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial") (internal quotation marks omitted).

### C.   Whether Defendants are Entitled to Summary Judgment on Plaintiff's Failure to Intervene Claims.

Defendants argue that Plaintiff's failure to intervene claims must be dismissed because they require, as their predicate, that Plaintiff establishes a constitutional violation. The court agrees.

A police officer can be liable for failure to intervene only when "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008) (citing *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988)). "A police officer may be liable for failure to intercede only where he [or she] observes or has reason to know that [other] officers violated someone's constitutional rights." *Buari v. City of New York*, 2021 WL 1198371, at *17 (S.D.N.Y. Mar. 30, 2021) (internal quotation marks and citation omitted) (second alteration in original). However, "[t]here can be no failure to intervene claim without a primary constitutional violation." *Id.* (internal quotation marks omitted).

Because Plaintiff cannot establish that his constitutional rights were violated in either of his arrests or criminal prosecutions, he fails to prove an essential element of his failure to intervene claims. Defendants' motion for summary judgment with regard to Counts III and VIII is therefore GRANTED.

40

## CONCLUSION

For the foregoing reasons, the court GRANTS Defendants' motion for summary judgment (Doc. 39) and enters judgment in Defendants' favor on each count of Plaintiff's Complaint.

SO ORDERED.

Dated this 8th day of December, 2021.

Christina Reiss, District Judge
United States District Court